1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NXP USA, INC., and NXP B.V.,

                  Plaintiffs,

      v.

IMPINJ, INC.,

                Defendant.

CASE NO. 2:20-cv-01503-JHC

MEMORANDUM OPINION RE:
SUMMARY JUDGMENT – THE '092
PATENT

As stated in the Court's May 27, 2023, order (Dkt. # 505), the Court issues this memorandum opinion to provide the balance of its reasoning to support its grant of summary judgment to Impinj, Inc. as to U.S. Patent No. 7,257,092 (the '092 Patent).

# I

## BACKGROUND

A.    The '092 Patent

The '092 Patent describes techniques for communicating between a "communication station" (RFID reader) and a "data carrier" (RFID tag). '092 Patent at 1:5–8.  Prior art methods used a two-step process for communication between a data carrier and a communication station. The RFID system would first conduct an "inventorization procedure" during which the communication station would identify all the data carriers within its range. *Id.* at 1:10–38.  After

the inventorization procedure, the data carrier would transmit "useful data" to the communication station upon request. *Id.* at 1:38–47. The "disadvantage" of this two-step method was that "it [took] a relatively long time" for the "useful data" to become usable by the communication station. *Id.* at 1:42–44.

The '092 Patent purports to improve upon the prior art by using a communication procedure in which the "identification data block" and "useful data" are transmitted together. *Id.* at 11:7–17 ("[T]he invention is distinguished in that not only are parts of the identification data blocks IDB transmitted into the communication station 1 in the course of carrying out an inventorization procedure, but that during the inventorization procedure the specific useful data n×UDB desired and/or required in the communication station 1 are also simultaneously transmitted."); Dkt. # 135 at 14. This simultaneous transmission shortens the time it takes for the communication station to obtain the "useful data" stored in the data carriers. '092 Patent, 3:51–59.

Claim 1 of the '092 Patent is representative. It states:

> A method of communicating between a communication station (1) and at least one data carrier (2 (DC)), which data carrier (2 (DC)) comprises a characteristic identification data block (IDB) and useful data (UD), by said method an inventorization procedure is carried out, the inventorization procedure may consist of successive procedure runs and consists of at least one procedure run, and after the inventorization procedure terminates, at least one part of the identification data block (IDB) of the at least one data carrier (2 (DC)) is known in the communication station (1), and by which method a transmission of specific useful data (n×UDB) is carried out from the at least one data carrier (2 (DC)) to the communication station (1) such that during the implementation of the inventorization procedure at least one part of a block region (NKP-IDB) of the identification data block (IDB) not yet known in the communication station (1) and, in addition, said specific useful data (n×UDB) are transmitted from the at least one data carrier (2 (DC)) to the communication station (1).

*Id.* at 17:47–65. It is important to observe that claim 1 requires that the tag return two types of data to the reader: (1) at least part of an "identification data block (IDB)" and (2) "specific useful

1    data (n×UDB)." This data must be transmitted to the data carrier "during the implementation of

2    the inventorization procedure," such that at least one part of each data type is "known" to the

3    reader by the time the "inventorization procedure terminates." *Id.* at 17:53–65.

4    B.    The Accused Products

5         Impinj's accused products implement the "Gen2 protocol," an industry standard protocol

6    for RFID communications. Dkt. # 283-4 at 6–7, 11–21. The Gen2 protocol requires that a tag's

7    memory be separated into four distinct memory blocks: (1) "Electronic Product Code" (EPC)

8    memory, (2) "TID" memory, (3) Reserved memory, and (4) User memory. Dkt. # 283-4 at 14.

9         First, EPC memory contains a code which "identifies the object to which the Tag is or

10   will be attached." Dkt. # 285-1 at 45. Second, "TID" is defined as "Tag-identification or Tag

11   identifier, depending on context." Dkt. # 285-1 at 21. TID memory must contain "sufficient

12   information for an Interrogator to uniquely identify the custom commands and/or optional

13   features that a Tag supports." *Id.* at 52. TID memory "may also contain Tag- and manufacturer-

14   specific data (for example, a Tag serial number)." *Id.* Third, Reserved memory "shall contain

15   the kill and and/or access passwords [of the tag]." *Id.* at 45. Fourth, User memory "allows user

16   data storage," configured as "one or more files." *Id.* at 52, 45. A graphic representation of

17   theGen2 protocol's memory is provided below:

18

19

20

21

22

23

24

Figure 6.19: Logical memory map

*Id.* at 45.

In the default Gen2 protocol, there is an "Inventory" process, which involves "[i]dentifying individual tags from the chosen population." *Id.* at 23. In the default Gen2 inventory process, (1) a reader issues a command to initiate an inventory round, (2) one or more selected tags from the chosen population respond by "backscattering" a random number (the "RN16"), (3) the reader acknowledges the tag's RN16 by parroting back the RN16 provided by the tag; (4) the reader requests the Electronic Product Code (EPC) from one of the responding tags, and (5) the tag responds by "backscattering" its EPC. *See generally* Dkt. ## 285-1 at 139, 59–60; 282 at 12; 421 at 5–6. The tag is then able to transmit other information (like data in User memory) to the reader. This default Gen2 inventory process is illustrated below:



Figure E.1: Example of Tag inventory and access

Dkt. # 285-1 at 139.

The accused tags are Gen2 compliant. Dkt. # 283-4 at 6. But the accused products modify the default Gen2 protocol through what Impinj calls its "FastID" feature. In the default Gen2 inventory procedure, the only data transmitted during inventorization from tag memory is the tag's EPC. The process "still requires a couple of commands" for the reader to learn the tag's TID. Dkt. # 283-8 at 2. According to Impinj's marketing materials, however, the FastID "short-cycle[s] the process of getting the TID." *Id.* With FastID, the tags "backscatter both their EPC and TID as part of their response to an ACK command from the reader." *Id.* In other words, the FastID system transmits both EPC data and TID data simultaneously. *See* Dkt. # 283-1 at 4 (Impinj's expert, Dr. Kenney, stating that "[u]nder the Gen2 Specification, the sequence for accessing a TID requires a sequence of commands [], and FastID allows the TID to be read with fewer commands than that provided by the standard"). Impinj touted the "EPC+TID"

feature of FastID as "2–3 times faster than previous methods."  Dkt. # 281-13 at 6.  An

illustration of the comparison between a system with and without FastID is found below:



Dkt. # 283-8 at 2.  The accused tags only send EPC data and TID data during inventorization.

C.    Procedural History

The '092 Patent has traveled a long and circuitous path in this litigation.

During claim construction, the Court construed two terms in the '092 Patent that relate to

the issues at hand.  First, the Court adopted *NXP*'s proposed construction and construed

"characteristic identification data block (IDB)" to mean "identification data stored in memory."

Dkt. # 247 at 12–16.  The Court noted that "[w]hen broken down, the term refers to (1) a block

(2) of data (3) used for identification."  *Id.* at 13.  Second, the Court construed "specific useful

data (n×UDB)" to mean "some, but not all, useful data (UD)."  *Id.* at 16–20.  The parties

stipulated early in this litigation that "useful data (UD)" means "data stored in memory, not

including the characteristic identification data block (IDB)," and that the two categories are

mutually exclusive.  Dkt. # 128 at 1; *see also* Dkt. ## 283-1 at 8, 319 at 7, 332 at 10.

The parties then cross-moved for summary judgment. Dkt. ## 284, 294 (Impinj's motion); Dkt. ## 277, 282 (NXP's motion). The Court denied both motions as to the '092 Patent. Dkt. # 380 at 17–25. In doing so, the Court at least implied that the term "identification data block" carries a more specific meaning than provided in its initial claim construction order. The Court stated that the "identification data block" of the '092 Patent refers to uniquely identifying data *used* by the reader during inventorization. *Id.* In light of this shift in construction, the Court granted Impinj an opportunity to file a renewed motion for summary judgment with additional non-infringement arguments. *See* Dkt. # 416 (order granting leave to file renewed motion); Dkt. ## 421, 430 (renewed motion); Dkt. # 433 (NXP's opposition to renewed motion).

The Court initially denied Impinj's renewed motion for summary judgment. Dkt. # 469. But in doing so, the Court took another stab at interpreting the amorphous '092 Patent. The Court stated:

> Upon further reflection, the Court finds its implicitly modified construction went too far: Based in part on a misunderstanding of the term "inventorization," the Court implicitly construed the claims to require that the "identification data block" refer to identification data stored in memory *used by the reader* during inventorization. But the Court does not believe the claim language requires such a limitation. Accordingly, the Court reverts to its initial construction of the term: "identification data stored in memory."

*Id.* at 8. The Court further reasoned:

> At bottom, the claim requires two things: that (1) "at least one part of the identification data block" and (2) "specific useful data" are "known" in the communication station "after the inventorization procedure terminates." '092 Patent at 17:51–63. It does not require that the identification data block be "used" in any particular way during (or after) the inventorization procedure. Nor does it require that the *reader* (rather than the system as a whole) use the identification data to uniquely identify a tag.

*Id.* at 9; *see also id.* at 8–11.

The Court therefore settled on a final construction of "identification data block," construed to mean "identification data stored in memory."[1]  Based on that construction, the Court was all but satisfied that the accused products did not infringe the '092 Patent because they transmit only identification data during inventorization, not "specific useful data."  The EPC undoubtedly qualifies as part of the "identification data block," and almost all of the "TID" memory block (defined as "Tag-identification or Tag identifier, depending on context," Dkt. # 285-1 at 21) similarly qualifies.  But the Court denied Impinj's renewed motion for summary judgment based on concerns about two (of 96) bits of TID data—the "File" (F) and "Security" (S) indicator bits—that were not as straightforwardly "identifying" as the rest of the TID memory block.  *Id.* at 12–13.

Impinj then moved for reconsideration (Dkt. # 483) of the Court's order, and NXP provided a response (Dkt. # 493).  The Court granted Impinj's motion for reconsideration and, accordingly, granted Impinj summary judgment of non-infringement as to the '092 Patent.  Dkt. # 505.  In the order granting reconsideration, the Court provided some reasoning for its conclusion.  *Id.*  But given the Court's busy docket at the time (including several pending motions and a looming trial date on another patent in this case), the Court stated that it would provide its complete reasoning by separate order at a later date.  *Id.*

## II

### LEGAL STANDARDS

"Summary judgment is appropriate when the moving party demonstrates that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[1] Accordingly, the Court's complete reasoning for its final construction of the term can be found at Dkt. # 247 at 12–16 (initial claim construction order), Dkt. # 469 at 8–11 (order on renewed motion for summary judgment), and within this order.

law.'" *Spigen Korea Co. v. Ultraproof, Inc.*, 955 F.3d 1379, 1383 (Fed. Cir. 2020) (quoting Fed. R. Civ. P. 56(a)).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In evaluating a motion for summary judgment, "[t]he court must afford all reasonable inferences and construe the evidence in the light most favorable to the non-moving party." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1323 (Fed. Cir. 2009) (citing *Anderson*, 477 U.S. at 255).  Infringement (or non-infringement) can be decided at summary judgment when there are no genuine disputes of fact. To prove infringement, the patentee "must establish by a preponderance of the evidence that one or more claims . . . read on the accused device[s]." *Cross Med. Prod., Inc. v. Medtronic Sofamore Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005). "Where the parties do not dispute any relevant facts regarding the accused product . . ., but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment." *Gen. Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997).  Infringement is "properly decided upon summary judgment when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001)

### III

#### DISCUSSION

Impinj is entitled to summary judgment of non-infringement as to the '092 Patent.

Claim 1 of the '092 Patent (which is representative) requires that a tag return two types of data to a reader: (1) at least part of the "identification data block (IDB)" and (2) "specific useful data (n×UDB)." '092 Patent at 17:54–65.  This data must be transmitted to the data carrier "during the implementation of the inventorization procedure," such that at least one part of each

data type is "known" to the reader by the time the "inventorization procedure terminates." *Id.* at 17:53–65.  The parties agree that a given data block is either part of the "identification data block" or is "useful data," and that the two categories are mutually exclusive.  *See, e.g.*, Dkt. ## 128 at 1 (stipulating that "useful data (UD)" means "data stored in memory, not including the characteristic identification data block (IDB)"), 283-1 at 8, 319 at 7, 332 at 10.

The parties dispute whether Impinj's accused tags transmit both categories of data—part of the "identification data block (IDB)" and "specific useful data (n×UDB)"—during inventorization.  Using Impinj's "FastID" feature, the accused tags "backscatter both their EPC and TID as part of their response to an ACK command from the reader."  Dkt. # 283-8 at 2. Infringement hinges on how the EPC memory block and TID memory block are characterized: Are they part of the "identification data block," or are they instead "specific useful data"?

The parties do not dispute that the EPC is part of the "identification data block."  And for good reason: As defined by the Gen2 protocol, the EPC "identifies the object to which the Tag is or will be attached."  Dkt. # 285-1 at 45.  This is plainly identification data stored in memory transmitted during inventorization, and thus qualifies as part of the "identification data block."[2]

The more difficult question (and the subject of much of this litigation) is whether the TID memory block is part of the "identification data block" or is instead "specific useful data."  NXP asserts that TID memory (or a subset thereof) constitutes "specific useful data."  According to NXP, the accused products transmit both data from EPC memory (the claimed "identification data block") and TID memory (the claimed "specific useful data"), so the accused products

---

[2] In one of NXP's "alternative" infringement theories, NXP asserted that *EPC* memory constitutes "specific useful data" and that *TID* memory serves as the "identification data block"—the opposite of its primary infringement theory.  Dkt. # 293-3 at 4.  The Court held that this theory was not timely disclosed and that NXP could not rely on it.  Dkt. # 569 at 3.  But even if timely disclosed, the theory makes little sense.  It is difficult to imagine a block of data that better fits within the "identification data block" category than the product code found in the EPC.

infringe.  Impinj contends that TID memory is not "specific useful data," but is instead part of the "identification data block."  And because only data from the "identification data block" is transmitted during inventorization (data from EPC and TID memories), Impinj says that the accused products do not infringe.

The Court agrees with Impinj.  The Court concludes that TID memory is part of the "identification data block," which the Court construed to mean "identification data stored in memory."[3]  Dkt. ## 247 at 12–16, 469 at 8.  Because the accused tags transmit data only from the "identification data block" and do not transmit any "specific useful data," they fail to satisfy each limitation of the '092 Patent.

The Gen2 protocol defines "TID" as "Tag-identification or Tag identifier, depending on context."  Dkt. # 285-1 at 21.  This description suggests that TID memory carries identification data.  The Gen2 protocol states that TID memory "may [] contain Tag- and manufacturer-specific data (for example, a Tag serial number)."  *Id*. at 52.  TID memory must contain an 8-bit "class identifier" and must contain "sufficient identifying information . . . for an Interrogator to uniquely identify the custom commands and/or optional features that a Tag supports."  *Id.* at 45.  In one version of TID memory, the TID memory block contains "an 8-bit manufacturer identifier . . . a 48-bit Tag serial number (assigned by the Tag manufacturer)," and "the composite 64-bit TID . . . is unique among all classes of Tags."  *Id.*  at 52.  In another version, a large portion of TID memory is "defined" in reference to the "GS1 EPC Tag Data Standard."  *Id.*  And TID memory is typically "permalocked" by the tag manufacturer, which allows the serial number contained within TID memory to serve as a fixed means for identifying the tag.  *Id.*  Testimony by Franz Amtmann—the named inventor of the '092 Patent and NXP employee—similarly

---

[3] The Court adopted this interpretation during claim construction at the urging of *NXP*.

MEMORANDUM OPINION RE: SUMMARY
JUDGMENT – THE '092 PATENT - 11

suggests that TID memory is part of the "identification data block."  *See* Dkt. # 285-2 at 4 ("Q. . . . Are you familiar with the term 'TID,' T-I-D? A. TID, yes. Q. What is a TID? A. Tag identification data. Q. . . . Is a TID an identifier? A. You are talking about T-I-D? Q. Yes, sir. A. Yes, it's an identifier of a tag, yeah."); *see also id.* at 5–6 ("Q. Okay. And then what does it mean for the EPC and TID to be 'part of the RAIN RFID unique tracking identifier'? A. It means that the EPC, where we have no control about the user-wise entities, but at least the EPC, the TID, we guarantee that you have a unique tracking identifier of the whole label.").

Plainly, then, TID memory contains not only identification data, but *uniquely identifying* identification data.  TID memory stands for "Tag-identification or Tag identifier"; it contains a serial number and other identifying information; it uniquely identifies the commands and features of the tag; and it is permalocked by the tag manufacturer, providing a constant identifier. Indeed, the EPC and TID memories are far more alike than different.  While EPC memory contains a user-programmable *product* identifier and TID memory contains a manufacturer-locked *tag* identifier, both are *identifiers*.  TID memory contains "identification data stored in memory," and is thus part of the "identification data block."

The Court also observes that the '092 Patent built on certain "prior art" discussed in the patent.  The '092 Patent describes the "ISO/IEC 15693-3 standard" as a "known" method in the field.  '092 Patent at 1:20.  In the ISO/IEC 15693-3 standard, there is both a "unique identifier" (UID) and more general "VICC memory."  See generally Dkt. # 285-9 at 9, 13.  The '092 Patent arguably built on the typology of the ISO/IEC 15693-3 standard: "identification data block" roughly corresponds to the ISO/IEC 15693-3 standard's UID, and "useful data" roughly corresponds to the ISO/IEC 15693-3 standard's VICC memory.  See also Dkt. # 247 at 15 (relying on the ISO/IEC 15693-3 standard—at NXP's urging—during claim construction).

The Court previously determined that whether a given Gen2 memory block (e.g., TID memory) is more analogous to the ISO/IEC 15693-3 standard's UID or VICC memory presents a question of fact. Dkt. # 469 at 8. While the Court continues to believe that this inquiry presents a factual question, analogizing to the ISO/IEC 15693-3 standard nevertheless provides compelling evidence that TID memory is part of the "identification data block." The ISO/IEC 15693-3 standard discloses a 64-bit UID that includes a 48-bit serial number, an 8-bit manufacturer code, and 8 bits of data labeled "E0." Dkt. # 285-9 at 9. The TID memory block similarly contains an 8-bit manufacturer identifier and a 48-bit tag serial number (among other things). It is tough to ignore the similarities between TID memory and the ISO/IEC 15693-3 standard's UID.

NXP argues that in the default Gen2 protocol, it is the EPC that is sent during inventorization and relied on to identify the tags. NXP says that TID memory, by contrast, is but another form of data that can be transmitted after inventorization. But how the default Gen2 protocol's inventorization process operates is not particularly relevant. Nor is it relevant, given the Court's construction, whether a reader *relies* on the EPC during inventorization, or whether *end users* rely on the EPC or TID as the primary means of identification.[4] As described in the Court's previous order (Dkt. # 469 at 8–11), the claims simply do not require that a reader or an end user "use" the identification data block exclusively for any given purpose. The claims require only that the identification data becomes "known" to the reader during an inventorization

---

[4] Even if the claims were read to require reliance by the reader, as alluded to in the Court's prior order, it is not clear that the reader in the default Gen2 protocol truly *relies* on the EPC (and the EPC alone) to identify the tag as NXP asserts. Rather, it appears that the reader learns the identity of the tag (that is, with which tag it is communicating) through transmission of a random, 16-digit "RN16" value. If so, then any differences between the EPC and TID memory blocks further dissipate. While the default Gen2 protocol elects to provide only one type of identification data during inventorization (EPC data), there is no reason why Impinj's inventorization process could not send two types of identification data (EPC data and TID data).

process.  So the relevant inquiry must focus on (1) the nature of data transmitted (that is, whether it is identification data) and (2) whether the data becomes "known" to the reader during an inventorization process.

Equipped with the FastID feature, Impinj's products transmit both EPC and TID data to the reader during an inventorization process.  Both the EPC and TID data provide identifying information (even if different types of identifying information) and become "known" to the reader through inventorization.  The transmission of the EPC may provide identifying information to the RFID system; but nothing stops the RFID system from obtaining *more* identification data through transmission of the tag-identification information (like the tag serial number) found within TID memory.  Both the EPC and TID memories are part of the "identification data block."

But the Court previously expressed concern about whether the *entire* TID memory block could be classified as part of the "identification data block."  Dkt. # 469 at 12–13.  In several of NXP's alternative infringement theories, NXP pointed to two bits of TID memory (of 96 total bits) which NXP said are "specific useful data" and are not part of the "identification data block."  Dkt. # 293-3 at 3–4.  First, TID memory contains a "Security (S) indicator" bit, which indicates "whether a Tag supports the Authenticate and/or Challenge commands."  Dkt. # 285-1 at 52.  Second, TID memory contains a "File (F) indicator" bit, which indicates "whether a Tag supports the FileOpen command." [5]  *Id.*  NXP says that these two bits are "specific useful data," rendering the tags infringing.

---

[5] In its motion for reconsideration, Impinj argues that its tags do not meaningfully use either the Security bit or File bit.  Impinj says that "the F bit is always zero because none of the accused ICs have ever supported the FileOpen command," and that the "S bit is zero on all (but possibly one) accused [tag]."  Dkt. # 483 at 6.  But Impinj has not explained why this is relevant.  If the indicator bit is "0," it is still indicating something: that the tag does not support a certain command or feature.

MEMORANDUM OPINION RE: SUMMARY
JUDGMENT – THE '092 PATENT - 14

1    Upon reconsideration, the Court concludes that the presence of the File and Security bits

2  do not render the accused tags infringing.  The two bits at issue *are* identifying and properly fit

3  within the definition of "identification data block."  These bits "*uniquely identify* the custom

4  commands and/or optional features that a tag supports."  Dkt. # 285-1 at 52 (emphasis added).

5  They serve a fundamentally identifying purpose: identifying tag functionality to benefit the

6  inventorization process.  The bits tell the RFID system information about the tag: They explain

7  whether the tag can support the Authenticate, Challenge, and FileOpen commands.

8    The File and Security bits are therefore fundamentally different than, say, the "User"

9  memory block of the Gen2 standard.  While the File and Security bits may look different from a

10  serial number, they still serve a similar identifying function by providing information about the

11  nature of the tags and the operation of the tags to the RFID system.  By contrast, the open-ended

12  User memory block allows the user to store all sorts of information unrelated to tag functionality

13  and tag inventorization.  *Id.* at 45, 52 ("User memory allows user data storage.").  It is the User

14  memory block—not TID memory—that more closely resembles "useful data" in the '092 Patent.

15  The File and Security bits are therefore "identifying" and properly fall within the "identification

16  data block."  This alone suffices to grant Impinj's motion for summary judgment.

17    But *even if* the File and Security bits in TID memory are not deemed to be identifying in

18  the strictest sense (though they are), the presence of two bits within TID memory does not

19  destroy the identifying character of TID memory *as a whole*.  First, the claims describe an

20  "identification data *block*."  *See* '092 Patent at 17:55 (emphasis added).  Accordingly, the proper

21  inquiry is whether the *block* carries identification data.  As described above, the TID memory

22  block serves such an identifying purpose: The Gen2 Protocol describes TID memory as a "Tag

23  identifier" that contains information like a serial number.  Dkt. # 285-1 at 21, 52.  Considered as

24  a block, TID memory is part of the "identification data block" even if it contains File and

1   Security bits.  There is no reason to believe that the infringement inquiry should be undertaken

2   on a bit-by-bit, atom-by-atom basis.  The proper unit of analysis is not so granular.

3           Second, the '092 Patent contemplates that the "identification data block" can contain

4   *some* limited data that is not strictly identifying.  The specification describes "special data []

5   included in an identification data block."  '092 Patent at 17:11–12.  This "special data" is "not in

6   any way necessary for specific applications of the data carrier," but is still "included in an

7   identification data block" because it is "useful or absolutely necessary for other applications."

8   *Id.* at 17:12–16.  Even if the Security and File bits are deemed "non-identifying," the

9   identification data block's "special data" would allow for inclusion of these bits: They are

10  "useful" or "necessary" for "other applications."

11          Third, if the File and Security bits are not themselves "identifying" in the strictest sense

12  of the word, they are, at minimum, ancillary to identification.  Unlike the open-ended memory

13  found in the User memory block (which could contain any information desired by the user), the

14  File and Security bits are helpful to the inventorization/identification process itself: They tell the

15  RFID system whether the tag can support the Authenticate, Challenge, and FileOpen commands

16  (and thus the type of tag).

17          Simply put, it is hard to imagine that a POSITA would read the '092 Patent to cover any

18  tag that transmits even a single bit of data during inventorization that is not "identifying" in the

19  purest sense of the term.  An "identification data block" (like the TID memory block) does not

20  lose its identifying character if a single bit is out of place.  And the File and Security indicators

21  are not mere random bits of data: These bits are identifying in their own right because they

22  "uniquely identify" the functionality of the tags and assist with inventorization.  Dkt. # 285-1 at

23  52.

24

If transmission of a single stray "non-identifying" bit during inventorization could trigger infringement, absurd results could follow. If this theory were correct, the '092 Patent would seemingly capture almost any RFID system that needs to transmit some ancillary, "non-identifying" data during inventorization. Indeed, under such an interpretation, even the *Gen2 protocol itself* would infringe the '092 Patent. Under the Gen2 protocol, the EPC memory block (which surely qualifies as part of the "identification data block") can contain various "indicators" analogous to the File and Security indicator bits found in TID memory. For example, EPC memory must contain a "StoredPC" (Dkt. # 285-1 at 46), which in turn can include a "User-memory indicator" (indicating whether the tag "is capable of allocating memory to File_0"), an "XPC_W1 indicator" (indicating whether the tag "implement[s] XPC_W1"), and a "numbering system identifier toggle" (indicating whether the application is "referred to as a GS1 EPCglobal™ Application"). Dkt. # 285-1 at 47–48. If a product infringes when a single bit is transmitted during inventorization that does not identify a tag, then the Gen2 protocol itself—which includes EPC memory with various "indicators"—would infringe because the tag's transmission of the EPC alone would simultaneously transmit an "identification data block" and "useful data." There is no reason to believe that the '092 Patent should be read to prohibit any product that happens to transmit a single bit of arguably non-identifying information alongside the rest of its identification data block.[6]

_____

[6] If, however, the patent were read to mean that the "identification data block" cannot contain even a single bit of arguably non-identifying information, then the Court would likely be required to revisit the meaning of "useful data."

The parties stipulated early in this litigation that "useful data" refers to "data stored in memory, not including the characteristic identification data block (IDB)" (Dkt. # 128 at 1), so any given bit of data must either be part of the "identification data block" or be "useful data." As Impinj points out, however, the parties did so when NXP had disclosed only one infringement theory, in which the *entire* TID memory block is treated as a single block. Dkt. # 490 at 9. Only later did NXP disclose its "two-bit" theory.

1
2
3
4
5
6
7
8

The '092 Patent is a muddled document.  As the Court's numerous attempts at interpretation make clear, the boundaries of "identification data block" and "useful data" are amorphous (to name but two confusing elements of the patent).  In an overly stylized and simplified hypothetical RFID system, the '092 Patent's typology might make sense: There might be one memory block consisting of *only* a single identifier in the form of a serial number (and *nothing* else), and a separate block of memory that contains *any* other data.  But when applied to real-world applications like the accused products, the '092 Patent provides far less certainty about its coverage.

9
10
11
12

Notwithstanding the patent's ambiguity, the Court concludes that no reasonable jury could find for NXP.  The entire TID memory block—including the File and Security bits—is part of the "identification data block" because it is "identification data stored in memory."  Accordingly, the Court grants summary judgment of non-infringement to Impinj.

13
14

**IV**

**CONCLUSION**

15
16

For the reasons stated within this memorandum opinion, the Court grants summary judgment for Impinj as to the '092 Patent.

17
18
19
20
21
22
23
24

If transmission of a single non-identifying bit during inventorization renders a tag infringing, then the '092 Patent must allow for data that is neither in the "identification data block" nor is "useful data." Otherwise, the patent would presumably capture nearly every RFID system.

Dated this 7th day of July, 2023.

John H. Chun
United States District Judge